TOWN OF SAUGUS & others *vs.* WALTER NEWBURY.[1]

Essex.   February 10, 1983. — April 5, 1983.

Present: GRANT, CUTTER, & KASS, JJ.

*Municipal Corporations,* Municipal finance, Collective bargaining, Fire fighters. *Labor,* Collective bargaining. *Arbitration,* Arbitrable question.

A clause in a collective bargaining agreement between a town and a union of firefighters requiring the town to maintain not less than forty-eight employees in its fire department was unenforceable against the town, as the size of the town's total expenditures for fire protection was not an issue which the town and its managerial officers could delegate for determination by a collective bargaining contract, or by arbitration under such a contract. [614-615]

CIVIL ACTION commenced in the Superior Court Department on December 11, 1981.

The case was heard by *O'Leary,* J., a District Court judge sitting under statutory authority.

*Robert Emmett Mullin, Jr.,* for the plaintiffs.

*David B. Rome* for the defendant.

CUTTER, J.   The town of Saugus and Local 1003, International Association of Firefighters (the Union) entered into a collective bargaining agreement (the Agreement) effective for two years ending June 30, 1982.   The 1980 town meeting of Saugus appropriated, at the request of the town manager, sufficient funds to provide for full compliance with the Agreement by the fire department for the fiscal year (F.Y.) 1981.   See G. L. c. 150E, § 7(b).

Article V, § 1, of the Agreement (the job security clause) required the town to maintain in the fire department not

---

[1] Other parties are the chief of the town fire department and the temporary town manager.   Newbury was president and representative of Local 1003, International Association of Firefighters, AFL-CIO, CLC.

less than forty-eight employees (exclusive of the chief). In June, 1981, the department had forty-eight employees. For F.Y. 1982, the fire chief, the acting town manager, and the selectmen requested an appropriation sufficient to maintain (during F.Y. 1982) the fire department at the level of forty-eight employees. The town meeting, however, appropriated a significantly smaller amount.

Because of the inadequate appropriation, layoff notices were sent to five firefighters on June 22, 1981. These layoffs never became effective. Three firefighters retired as of July 1, 1981, and were not replaced. The retirement of the chief in office on July 1 and of another firefighter may have been in prospect. See note 3, *infra.*

Despite the receipt of State reimbursement funds and a further appropriation to the fire department by a special town meeting, the total amount appropriated for F.Y. 1982 was sufficient to maintain only forty-three employees and a chief, but no firefighters have been discharged as a consequence of the reduced appropriations. In July, 1981, the town had a free cash account of $550,000 and an additional reserve account. From these funds, a sufficient amount probably could have been obtained to support the minimum number of firefighters required by the Agreement.

The Union, following the layoff notices of June, 1981, filed grievance notices which, upon a complaint in the Superior Court[2] for injunctive and declaratory relief, resulted in reference of the matter for arbitration under the Agreement. The arbitrator, after hearing, filed a report which ruled (1) that the job security provision of the Agreement was valid, despite the failure of the town meeting to fund it appropriately for F.Y. 1982, the second year of the Agreement, and (2) that the constraints of Proposition 2 1/2 (St. 1980, c. 580) did not permit the town to abrogate for F.Y. 1982 its contractual obligations under the job security clause of the Agreement, where the town had funds which

---

[2] A Union complaint, dated June 25, 1981, sought relief against the then proposed layoffs. Injunctive relief was denied on July 10, 1981. Expedited arbitration was ordered in September, 1981.

could be used for the purpose. Despite the fact that no fire-fighter had been laid off because of the town's failure to fund the job security clause for F.Y. 1982, the arbitrator awarded the Union the amount which it would have cost the town to comply with the job security clause in F.Y. 1982 (subject to certain adjustments mentioned in the margin).[3]

After the arbitrator's decision, the town filed in the Superior Court an application to vacate the arbitrator's award, apparently as a new proceeding. The application was denied on February 1, 1982, and the arbitrator's award then was confirmed. The town has appealed.

The town relies principally upon *Boston Teachers Local 66* v. *School Comm. of Boston*, 386 Mass. 197 (1982) (hereafter the 1982 case), decided May 12, 1982, over three months after the order now under review. In part 2 of the 1982 case, at 211-214, the Supreme Judicial Court considered a job security provision of a collective bargaining agreement similar in various respects to the job security provision discussed in the present case, viz., that "during the first two years of the agreement 'any teacher . . . with tenure . . . shall continue to be employed.'" See the 1982 case at 200-201. The court (at 213) held "that a job security clause is enforceable for periods not spanning more than one fiscal year." It also held (at 212) "that a provision in a collective bargaining agreement that attempts to restrict the ability of a school committee to determine *on an annual basis* the size of its teaching staff intrudes into an area of exclusive managerial prerogative" (emphasis supplied) because "[e]ssential to the management of the public schools is the ability to determine the appropriate size of the teaching staff in light of available funds." See the discus-

---

[3] One fire captain had been promoted to the position of acting chief while continuing to perform his duties as captain. The arbitrator concluded that this did not necessitate extra work by the remaining department employees. He also decided that any premium or overtime pay directly attributable to the reduced complement of firefighters, and in fact earned by the firefighters, should reduce the damages from the town's violation of the job security clause.

sion in *School Comm. of Newton* v. *Labor Relations Commn.*, 388 Mass. 557, 563-565 (1983, hereinafter the 1983 *Newton* case.)[4]

The 1982 case was in some respects a continuation of discussion in an earlier case between the same parties. *School Comm. of Boston* v. *Boston Teachers Local 66*, 378 Mass. 65, 70-72 (1979, hereinafter the 1979 case). As in the 1979 case, the 1982 case recognized (at 211) that certain prior decisions had been "[i]n the context of public education"; (at 211-212) that collective bargaining agreements "relating to class size and teaching load 'may be enforced where there has been no change in educational policy and funds are available'"; and (at 213), see *Boston Teachers Local 66* v. *School Comm. of Boston*, 370 Mass. 455, 464 (1976), that procedures for determining the timing and method of staff reduction (see the 1979 case at 72), the number and identity of affected employees, and the impact of the lay-off decision, may be the subject of negotiation and arbitration. See the 1983 *Newton* case, 388 Mass. at 564 & n.5. Some reliance was placed in the 1982 case (at 214) upon the provisions of general and special statutes relating to education. There was general recognition that variations between the statutes relating to Boston and similar statutes effective elsewhere in the Commonwealth must be considered (see, e.g., at 207, 209 and 214).

Despite the considerations just mentioned, we conclude that for Saugus the requirement in the Agreement of a minimum of forty-eight fire department employees is essentially a job security provision governed by the 1982 case. The Saugus Agreement provision, perhaps, is even more clearly destructive of the town's power to determine annually the employee size of its departmental units than that considered in the 1982 case. In any event, if the 1982 case is followed,

---

[4] Because the reduction in staff size was accomplished through retirements in the normal course, no question is here raised about the necessity to bargain over the method of accomplishing the reduction or the impact of any layoffs. Contrast the 1983 *Newton* case, 388 Mass. at 565.

such a clause may be enforceable only for "periods not spanning more than one fiscal year." This has the consequence that the funding of the Agreement by the Saugus town meeting for F.Y. 1981 did not preclude the town meeting from refusing funds for F.Y. 1982 sufficient to maintain the agreed minimum employment. The town meeting, we think, was entitled "to determine on an annual basis" the size of its fire fighting staff as a matter of fundamental public policy.[5] The size of the town's total expenditures for fire protection was not an issue which, under the reasoning and logic of the 1982 case (at 211), the town and its managerial officers could delegate for determination by a collective bargaining contract, or by arbitration under such a contract. Such substantive public policy decisions are not to be dealt with by arbitration. See *Berkshire Hills Regional Sch. Dist. Comm.* v. *Berkshire Hills Educ. Assn.*, 375 Mass. 522, 528-529 (1978); *School Comm. of Lynnfield* v. *Trachtman*, 11 Mass. App. Ct. 524, 527-529, *S.C.*, 384 Mass. 813 (1981), and cases cited. See also *School Comm. of Hanover* v. *Curry*, 3 Mass. App. Ct. 151, 154-157 (1975), *S.C.* 369 Mass. 683, 684-685 (1976). On "similar or analogous reasoning" to that in the 1982 case, we hold that collective bargaining cannot reach out to control by agreement, in the circumstances here present, subjects within the primary control of the annual town meeting. See the comparable problems discussed in *Marlborough Firefighters,*

---

[5] We perceive nothing in *Labor Relations Commn.* v. *Natick*, 369 Mass. 431, 435-442 (1976), contrary to the conclusion thus reached by us. The *Natick* case dealt principally (a) with whether collective bargaining agreements could control certain promulgated regulations by the fire chief and (b) with the question of determining the appropriate town representatives for collective bargaining (see especially at 438 n.5). Our conclusion also is not affected by cases dealing with statutory provisions as to compensation once accepted by a town meeting, which at least as to the compensation of individual town employees, may not be changed by action of a later town meeting. See *Labor Relations Commn.* v. *Selectmen of Dracut*, 374 Mass. 619, 627-629 (1978). See also as to pay increase provisions funded for one year of a two- or three-year collective bargaining agreement, the 1982 case, part 1, at 203-211. Compare *Quincy Educ. Assn.* v. *Quincy, ante* 66 (1982).

*Local 1714* v. *Marlborough,* 375 Mass. 593, 595-596 (1978); *Watertown Firefighters, Local 1347* v. *Watertown,* 376 Mass. 706, 710-716, especially 715 (1978).[6] See note 4, *supra.*

The arbitrator's report did not purport to be an interpretation of any ambiguous provisions of the Agreement. The town readily conceded that it had "not complied with the minimum compl[e]ment provisions" of the Agreement. The matter was not arbitrable and the award based upon a violation of the job security clause was beyond his authority. The orders confirming the arbitrator's award, and refusing to vacate that award, are reversed. The case is remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*

---

[6] Other decisions affecting the scope of permissible arbitration include *Boston* v. *Boston Police Patrolmen's Assn.,* 8 Mass. App. Ct. 220-223 (1979); *Boston* v. *Boston Police Superior Officers Fedn.,* 9 Mass. App. Ct. 898 (1980); *Taunton* v. *Taunton Branch of Mass. Police Assn.,* 10 Mass. App. Ct. 237, 242-243 (1980).